IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICH AUREL, #317239                          *

      v.                                         *   CIVIL ACTION NO. ELH-15-1127

WARDEN AT THE NORTH BRANCH           *
  CORRECTIONAL INSTITUTION

*******************************************************************************

MICH AUREL, #317239                          *

      v.                                         *   CIVIL ACTION NO. ELH-15-1797

WEXFORD HEALTH SOURCES, *et al.*          *

                                       *****

## MEMORANDUM

Mich Aurel,[1] a State prisoner who is self-represented, filed the above-referenced cases pursuant to 42 U.S.C. § 1983, against several defendants.  Case ELH-15-1127 ("Aurel I") was filed on April 20, 2015, and deemed filed against  Frank B. Bishop, Jr., the Warden at North Branch Correctional Institution ("NBCI"), where Aurel is an inmate.[2]  Case ELH-15-1797 ("Aurel II") was filed on June 18, 2015, against Wexford Health Sources, Inc. ("Wexford"), the private health care contractor for NBCI, and several individual health care providers: Bill Beeman, Janette Clark, and Colin Ottey, M.D. (collectively with Wexford, the "Medical Defendants").  Given the similarity of

_____

[1]  The Maryland Department of Public Safety and Correctional Services ("DPSCS") lists plaintiff as Mich Aurel on its "inmate locator" website.  Although plaintiff was prosecuted as Aurel Mich in the Maryland courts, I will refer to him per the DPSCS designation of Mich Aurel.

[2]  Aurel I was filed as a "Petition to Habeas Corpus in the United States District Court in Maryland State" and did not name any parties.  It was construed as a § 1983 complaint filed against the Warden of NBCI.

the allegations in the two cases, they were considered in October 2015.  *See* ECF 5 in both cases.

Aurel I (ELH-15-1127) was designated as the lead case.

The Court issued an Order to Show Cause in Aurel I (ECF 2) and in Aurel II (ECF 5), concerning Aurel's allegations of illness and inadequate medical care.  All defendants have responded.  *See* ECF 4 (Warden); ECF 7 (Medical Defendants).  The Warden's response to the show cause order is supported by exhibits.  ECF 4-2; ECF 4-3; ECF 4-4.

Wexford and the Medical Defendants also filed a motion for summary judgment (ECF 7), supported by exhibits.  *See* ECF 7-2; ECF 8-2 (Sealed) (collectively, "Medical Motion"). [3]  On December 30, 2015, the Court issued an Order (ECF 10) notifying Aurel that the Warden's show cause response will be construed as a motion for summary judgment ("Warden Motion").  No oppositions have been filed and the time to do so has expired.[4]  But, on October 19, 2015, January 21, 2016, and February 12, 2016, the Court received Aurel's letters, in which he complains that he has been denied "proper" treatment for "symptoms" he has had since 2009.  He claims about abdominal, chest, throat, liver, bladder, and kidney pain, along with blurred vision, and alleges that he had been denied unspecified medication.  ECF 6; ECF 12; ECF 14.  I shall construe these letters as Aurel's opposition to both motions.[5]

---

[3] All docket references are to the Court's electronic pagination.

[4] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), Aurel was advised that defendants had filed a dispositive motion, the granting of which could result in the dismissal of his case, and that he was entitled to respond to the motion within seventeen days, and that his failure to respond could result in the dismissal of his case or in the entry of summary judgment, without further notice of the court.  ECF 11.

[5] In his letter of January 21, 2016, Aurel seeks $1,000,000,000.00 in damages.  In addition to the current defendants, he refers to Nurse Practitioner Krista Bilak; Dr. Mahboob Ashraf; Assistant

The Court finds a hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).

For the reasons that follow, I shall grant the Warden's Motion and the Medical Motion.

## I. Factual Background

Aurel alleges that he has been "denied medical treatment to the symptoms [he] has [had] for

years."  He complains of many ailments, including abdominal, throat, and chest pain, and contends

that he has been experiencing coughing and blurred vision.  *See* Aurel I, ECF 1 at 2, 3.  Additionally,

he claims that since 2009, he has been denied treatment for multiple health problems, such as

abdominal pain, vomiting, positive blood in stool, constipation, and fever. *See* Aurel II, ECF 1 at 3.

He seeks $10,000,000 in damages.  Aurel supplemented his Complaint in Aurel II to allege that he

has experienced nausea, weakness, ear and throat pain, and that he has cancer in his throat, stomach,

pancreas, gallbladder, eye, and liver.  *Id*. at ECF 3 at 1-3.  As noted, in October 2015, the cases were

consolidated for all purposes.  ECF 5.

In response to Aurel I, the Warden states that Aurel was transferred to NBCI, where he has

been provided medical care by private health care contractors.  ECF 4-2; ECF 4-3, Bishop Aff. The

Warden affirms that he has no authority to perform or dictate the type of dental or medical treatment

received by inmates, nor has he been involved in Aurel's medical care.  ECF 4-3, Bishop Aff.

Alternatively, the Warden argues, through submission of over three hundred pages of Aurel's

verified medical records maintained by the Office of Inmate Health Services, that Aurel has been

provided constitutionally adequate medical care and treatment at NBCI.  *See* , *e.g.*, ECF 4-4 at 4-8,

---

Warden Jeff Nines; and Chief of Security William Bohrer.  ECF 12 at 2-3.   He does not, however,
discuss how these individuals violated his rights or caused him injury under the Eighth Amendment.
 Given the factual deficiencies, and at this point in the litigation, Aurel shall not be granted leave to
amend his complaint to add Bilak, Ashraf, Nines, and Bohrer as defendants.

10-20, 22-120, 122-167, & 172-313.

The Medical Defendants note that Aurel is a fifty-year old male incarcerated at NBCI.  They maintain, through the Affidavit of Robustino Barrera, M.D., Wexford's Medical Director at the Cumberland, Maryland prison complex, that Aurel has a medical history for hypothyroidism, asthma, constipation, cough, non-active tuberculosis, hyperlipidemia, and esophageal reflux, but he has never been diagnosed with any form of cancer, including throat, stomach, pancreas, gall bladder, eye, or liver cancer.  ECF 7-2, Barrera Aff., ¶¶ 4, 5.  In Dr. Barrera's 14-page Affidavit, dated November 20, 2015, he thoroughly describes plaintiff's care from May 6, 2015, to the date of November 4, 2015.  Moreover, he offers several uncontroverted medical opinions, including that plaintiff's care and treatment were within the applicable standard of care.  *Id.* ¶ 39.

Defendants present over 100 pages of relevant sealed records from Aurel's extensive medical history.  *See* ECF 8-2 (Sealed).  The records include chronic care visits, general sick-call visits, laboratory studies, and prescribed medication orders.  It is impossible to recount every detail contained in the records.  However, I have summarized below many of the relevant portions.

On May 18, 2015, Aurel was seen by Mahboob Ashraf, M.D., regarding a fungal infection in both feet.  ECF 8-2 at 1.  He was also informed that a consult request had been placed for him to receive an abdominal CT scan, but it was pending approval until after a conference with a gastrointestinal specialist, Dr. Maazaq Abdi.  ECF 8-2 at 1-3.  Dr. Ashraf found Aurel's abdomen to be soft, non-tender without organomegaly[6] or masses.  He renewed Aurel's medications, consisting

---

[6] Organomegaly is an abnormal enlargement of the organs.  *See* http://www.merriam-webster.com/medical/organomegaly.

of Colace, Qvar, Zocor, Zyrtec, Levothyroxine,[7] Sodium, Miralax,[8] Tolnaftate, Prilosec,[9] artificial

tears, Proair HFA,[10] lubri-skin, Simethicone, and Lisinopril. *Id.* A note in Aurel's chart reflects that

a gastrointestinal telemedicine conference was scheduled for June 18, 2015. *Id.*, at 4.

On May 24, 2015, Aurel was seen by Robert Claycomb, R.N., for a complaint regarding his

medications. Aurel indicated that he wanted to be placed on new medications and to discontinue

certain medications. *Id.* at 5. He was referred to a provider for further evaluation. *Id.* at 5-6

Aurel was seen by Nurse Practitioner Janette Clark on June 2, 2015, complaining: "I feel

awful." *Id.* at 7. He requested the renewal of his prescriptions of Qvar, Prilosec, and Ofloxacin.[11]

*Id.* at 7. It was noted that the Qvar and Prilosec prescriptions were current and a renewal was not

required. P.A. Clark further observed that the Ofloxacin was prescribed as a one-time course of

treatment and that Aurel did not have any condition warranting its prescription. *Id.* Aurel's

---

[7] Levothyroxine is used to treat an underactive thyroid (hypothyroidism). It replaces or provides more thyroid hormone, which is normally produced by the thyroid gland. *See* http://www.webmd.com/drugs/2/drug-1433/levothyroxine-oral/details.

[8] Colace and Miralax are used to treat constipation. *See* www.webmd.com/drugs/2/drug-4576/colace-oral/details and http://www.webmd.com/drugs/2/drug-17116/miralax-oral/details.

[9] Prilosec is a proton pump inhibitor that decreases the amount of acid produced in the stomach. It is used to treat symptoms of gastroeophageal reflux disease ("GERD") and other conditions caused by excess stomach acid. *See* https://www.drugs.com/prilosec.html. Simethicone is used to relieve the painful symptom of too much gas in the stomach and intestines. *See* http://www.mayoclinic.org/drugs-supplements/simethicone-oral-route/description/drg-20068838.

[10] Qvar and ProAir FHA are both indicated in the maintenance treatment of asthma. *See* http://www.rxlist.com/qvar-side-effects-drug-and center.htm and http://www.empr.com/proair-hfa/drug/2918/.

[11] Ofloxacin (otic route) is used to treat ear infections. *See* http://www.mayoclinic.org/drugs-supplements/ofloxacin-otic-route/proper-use/drg-20065162.

medication regimen was reviewed by Clark the following day.  *Id*. at 8-9.

Dawn Hawk, R.N., saw plaintiff on June 14, 2015, for his complaints of constipation, abdominal pain, and bloody stool.  *Id.* at 10.    He was provided with stool cards and instructions for their use.  Three days later Aurel returned the stool cards, which were found to be positive for occult blood.  *Id*. at 13.  Aurel was referred to a provider for further evaluation.

On June 18, 2015, Maaza Abdi, M.D., a gastroenterology specialist, evaluated plaintiff for abdominal pain, bloody stools, and anal bleeding.  ECF 8-2 at 87-90.  Abdi noted that Aurel had a history of GERD, diverticulitis, urinary tract infection, and a family history of colon polyps. Additionally, he reviewed Aurel's colonoscopy results and findings of March 8, 2012, which had revealed a few scattered diverticula, no active bleeding, a normal rectum, and no mucosal abnormalities, polyps, or masses.  *Id*. at 87-90.  Abdi noted that Aurel had suffered from abdominal pain for five years, with pain predominantly on the left side, and that he had reported weekly episodes of nausea and vomiting.  Abdi recommended that Aurel receive an abdominal CT scan followed by a colonoscopy and upper endoscopy, continue on the Prilosec,  and that Levsin[12]  and Metamucil be added to his regimen.  *Id*.  He also found no indication of acute distress.  *Id.* at 89.

Dr. Ashraf examined Aurel on June 19, 2015, for a chronic care visit related to his throat and gastrointestinal complaints as well as his hypertension and asthma.  *Id*. at 14-16.  Dr. Ashraf noted that Aurel had a sore throat related to Tonsillitis/Pharyngitis that had resolved using the antibiotic Amoxicillin, over-the-counter drops, and Chlorhexidine solution for gargling.  Ashraf made a

---

[12] Levsin or Hyoscyamine is used to treat a variety of stomach/intestinal problems such as cramps and irritable bowel syndrome.  *See* http://www.webmd.com/drugs/2/drug-4864-8004/levsin-oral/hyoscyamine---oral/details.    Metamucil is used to treat constipation.  *See* http://www.webmd.com/drugs/2/drug-13722/metamucil-oral/details.

number of recommendations (*id.* at 15), ordered a cardiovascular chronic care visit (*id.* at 16), and indicated that there was "No apparent distress" in plaintiff.  *Id.* at 15.

On June 24, 2015, Aurel was seen by Dr. Ashraf for a follow-up visit related to a gastrointestinal telemedicine conference held a week earlier.  *Id.* at 17-19.  Dr. Ashraf noted Dr. Abdi's recommendations and, accordingly, submitted a consult request for Aurel to receive an abdominal CT scan, upper endoscopy, and colonoscopy.  Further, he ordered a "comp. panel,"[13] stool culture, lipid panel, ova and parasites examination, hemoglobin screening, occult blood stool test, and thyroid panel.  *Id.*

Aurel was again examined by Dr. Ashraf on June 30, 2015, for a complaint of "severe constipation."  ECF 8-2 at 20.  He was provided with Metamucil powder in addition to Miralax and advised to increase his fluid intake.  Aurel's abdomen was examined and was found to be non-tender and without organomegaly or masses.  *Id.* at 20-21.

Kimberly Martin, R.N., noted on June 30, 2015, that Aurel had been approved on June 25, 2015, for an abdominal scan, colonoscopy, and endoscopy.  *Id.* at 22.

On July 16, 2016, Aurel received an abdominal CT scan.  *Id.* at 91-93.  John Pappas, M.D., found that Aurel's pancreas, spleen, adrenals, gallbladder, and kidneys were normal.  A "diffuse low-attenuation of the liver consistent with fatty infiltration" was observed.  *Id.* at 92.  In addition, "a few scattered colonic diverticula" were noted, along with "a small hiatal hernia."  *Id.*  A colonoscopy was recommended due to a "subtle area of colonic wall thickening" in the region of Aurel's sigmoid

---

[13] It is believed the physician's notes are referencing a comprehensive metabolic panel, a group of blood tests that provides an overall picture of the body's chemical balance and metabolism.  *See* https://www.nlm.nih.gov/medlineplus/ency/article/003468.htm.

colon.  *Id*.

Upon Aurel's return from the medical appointment, he denied any medical complaints.  His vital signs were taken and were all found to be within normal limits.  ECF 8-2 at 23.  As discussed, *infra*, a review of subsequent records showed that Aurel was diagnosed with diverticulitis.  ECF 8-2 at 27-29.

On July 21, 2015, Aurel was seen by Nurse Claycomb for complaints of shortness of breath ("SOB").  He reported that the heat was bothering him and his inhaler was empty.  Aurel's pre-treatment oxygen saturation level was 97%.  He was given an albuterol treatment and his post-treatment oxygen saturation level was 99%.  *Id*. at 24-26.  He was observed to be more relaxed after the treatment and was ordered on general lay-in (bedrest).  *Id*.

Two days later, on July 23, 2015, Aurel was seen by Dr. Ashraf to discuss his CT abdominal results.  *Id*. at 27-29.  Aurel complained of abdominal fullness and reported he was out of his constipation medications.  His medications were renewed.  *Id*.  And, Aurel was informed that his scan revealed an "8 mm attentuation lesion in the liver" and that a colonoscopy was recommended "due to findings of diverticulitis."  *Id.* at 27.

On July 30, 2015, Aurel was seen in his cell by Michele Schultz, R.N., for his complaint of SOB.  He was observed lying on his coat on the floor and dispensing three inhalations from his inhaler, "without inspiration."  ECF 8-2 at 30.  The objective examination found his skin was warm and dry, his lungs were clear, and his heart sounds were within normal limits.  He was observed to have no difficulty talking and was alert and oriented.  *Id*. at 30-31.  Schultz's assessment was that Aurel suffered from anxiety due to fear of an asthma attack from the heat, and he was educated regarding the proper use of his Qvar inhaler.  He was also provided with a cold compress and his cell

window was opened.  *Id.*

Aurel was seen by Janette Clark, N.P., on July 31, 2015, for a health assessment prior to undergoing a colonoscopy and upper endoscopy.  Clark noted that Aurel was not wheezing or in any respiratory distress.  His overall health was found to be stable.  *Id.* at 32-37.

On August 5, 2015, William Beeman, R.N., ordered preoperative x-rays of Aurel's chest and additional bloodwork.  ECF 8-2 at 38-39.  On August 12, 2015, Aurel was seen by Mercy Addai, R.N., who noted that Aurel was scheduled for a colonoscopy the following day.  He was on a clear liquid diet, an enema was scheduled, and Aurel was advised that he would be required to fast after midnight for the colonoscopy procedure.  *Id.* at 40.

Aurel was transported to Bon Secours Hospital ("BSH") in Baltimore on August 13, 2015, for his scheduled colonoscopy and an Esophagogastroduoendoscopy ("endoscopy").  *Id.* at 100-102.  The upper endoscopic procedure and results were normal, except that the antrum showed mild to moderate gastritis.[14]  *Id.* at 101.  A biopsy was taken of the antrum.  *Id.*  Aurel's colonoscopy revealed a negative rectal examination, but showed a few internal hemorrhoids, no other lesions, and mild diverticulosis of the sigmoid.  *Id.* at 102.  Biopsies were taken from the cecum, transverse colon, and sigmoid colon.  *Id.* at 102, 103.  Aurel's post-operative diagnosis was gastritis; no significant esophagitis; hemorrhoids; no active colitis; and mild diverticulosis of the sigmoid colon.  *Id.* at 100.  No malignancies were identified in the pathology.  *Id.* at 103-104.

Aurel was released from BSH and admitted to the prison infirmary, where he remained for

---

[14] Gastritis describes a group of conditions with one thing in common: inflammation of the lining of the stomach. The inflammation of gastritis is most often the result of infection with the same bacterium that causes most stomach ulcers.  *See* http://www.mayoclinic.org/diseases-conditions/gastritis/basics/definition/con-20021032.

twenty-four hours. *Id.* at 41-44.  He walked with a steady gait without assistance, denied pain or

bloating, ate without difficulty, no blood was observed in his stool, and he otherwise voiced no

complaints or concerns. *Id.*  Aurel was discharged from the infirmary on August 14, 2015. *Id.* at 45.

He denied abdominal pain and tenderness at that time. *Id.* at 45-47.

The pathology reports of Aurel's biopsies were reported to Dr. Abdi on August 14, 2015.

ECF 8-2 at 103.  His antrum stomach biopsy revealed mild chronic inflammation and superficial

vascular congestion, but was negative for Helicobacter Pylori.[15]  ECF 8-2 at 103-105.  The distal

esophagus biopsy showed mild chronic inflammation and was negative for fungal organisms.  The

cecum colon biopsy showed a mild chronic inflammation with no significant abnormality or

malignancy recognized.  Aurel's transverse and sigmoid colon biopsies showed mild chronic

inflammation and mild inflammation respectively, with no significant abnormality and no

malignancy. *Id.*

Dr. Ashaf saw Aurel on August 20, 2015, regarding his colonoscopy and upper endoscopy

report.  The results indicated that Aurel had gastritis, but no significant esophagitis and no active

colitis.  Aurel requested hemorrhoid cream, which was ordered.  He was continued on his current

medications and Vitamin A, C and E were ordered for another 120 days.   *Id.* at 50-53.

Aurel was again seen  by Dr. Ashraf on August 24, 2015, for a scheduled follow-up visit

associated with his colonoscopy and upper endoscopy. *Id.* at 54-58.  He reported that he was feeling

well and not taking most of his medications due to his dislike of their taste.  His vital signs and lab

work were checked and all were found to be within normal limits. *Id.*  Dr. Ashraf discontinued

---

[15] Helicobacter pylori ("H-Pylori") is a type of bacteria that causes infection in the stomach.
*See* https://www.nlm.nih.gov/medlineplus/helicobacterpyloriinfections.html

Aurel's Lisinopril, Colace, Simvastatin, and Ocuvite[16] medications based upon Aurel's report that he was not taking them. *Id.*

Colin Ottey, M.D., examined Aurel on September 6, 2015, for a chronic care visit. *Id.* at 59-61. He complained of a sore throat and hoarseness, but denied aspiration, chronic cough, dysphagia (difficulty swallowing), nausea, SOB, vomiting, and weight gain or loss. *Id.* at 59. Ottey classified Aurel's asthma as mild-persistent and Aurel reported symptom relief with his beta-agonist inhaler and steroid inhaler. *Id.* Ottey ordered updated lab work and reordered Aurel's fiber packs, hemorrhoid cream, Gas-X, and throat lozenges. *Id.* at 59-61.

Aurel was seen by Ricki Moyer, R.N., on September 8, 2015, for "multiple issues." *Id.* at 62. He had complaints of blood in stool, throat and ear pain, fever, swollen glands, and hoarseness, as well as his requests for hemorrhoid ointment, fiber packs, and Gas-X. *Id.* Aurel did not have a fever, his throat was not red or swollen, his glands were not swollen upon palpation, his ears were found to be unremarkable, and he was observed speaking clearly, without hoarseness. His vital signs were within normal limits. His medications were continued and it was noted that fiber packs, Gas-X, hemorrhoid ointment and lozenges had been reordered. *Id.* at 62-63. Aurel failed to appear for a nursing visit on September 19, 2015. *Id.* at 64-65.

On September 23, 2015, Aurel was seen by Kimberly Martin, R.N., for his complaints of hemorrhoids, toenail fungus, and abdominal discomfort. He indicated that he wanted to use suppositories rather than the cream he was utilizing. Aurel reported that he was no longer

---

[16] Simvastatin is used to lower cholesterol and triglycerides (types of fat) in the blood. *See* https://www.drugs.com/simvastatin.html. Ocuvite is an eye vitamin and mineral supplement. *See* http://www.ocuvite.com/.

experiencing rectal bleeding and his abdomen was improving, which he attributed to a change in his diet. *Id*. at 66.  Upon examination, Aurel's abdomen was found to be soft with active bowel sounds.  His toenails were observed to be dark in color, but with no visible signs of infection.  He was prescribed Anusol-HC and Tolnaftate.[17]  *Id*.  at 66-67.

Clark saw Aurel on September 30, 2015, for his request for medication renewal for throat lozenges, Levothyroxine, Lisinopril, Simvastatin, Miralax, and Simethicone.  ECF 8-2 at 68-72.  Clark noted that because Aurel had stated that his throat felt better after an antibiotic treatment, there was no need for him to receive throat lozenges, as they can worsen reflux.  Clark further observed that Aurel's Lisinopril and Simvastin medications had been discontinued due to Aurel's reported failure to take them.  Clark observed that Aurel's prescription for Simethicone was current.  As Aurel reported that he had a "burning smell" when he urinated, Clark ordered a "urine dip."[18]  Aurel asked to be placed back on the IV antibiotic he was on previously that year to reduce the bacteria and pain in his gut.  Clark informed him that he had been placed on an IV saline solution, not an antibiotic.  When Aurel claimed that he experienced pain when attempting to pull something out of his rectum, Clark told him not to do this, but to use his suppositories instead.  *Id*. at 68-72.

Aurel was seen by Nurse Claycomb on October 7, 2015, for his complaints of hemorrhoids

---

[17] Anusol-HC cream is used for reducing swelling, itching, and discomfort associated with certain rectal conditions.  *See* https://www.drugs.com/cdi/anusol-hc-cream.html.  Tolnaftate belongs to a group of medicines called antifungals, and is used to heal some types of fungal infections.  *See* http://www.mayoclinic.org/drugs-supplements/tolnaftate-topical-route/description/drg-20068886.

[18] A urine dipstick test is often done as part of an overall analysis.  A dipstick — a thin, plastic stick with strips of chemicals on it — is placed in the urine to detect abnormalities.  The chemical strips change color if certain substances are present or if their levels are above normal.  *See* http://www.mayoclinic.org/tests-procedures/urinalysis/basics/results/prc-20020390

and a sore throat. *Id.* at 73-76. Claycomb found that Aurel's suppository order was current, but no formulary request had been completed. A non-formulary request was completed by Dr. Ashraf that same day. Claycomb noted that Clark had stated that throat lozenges were not indicated for Aurel the preceding week. *Id.* at 73-76.

Nurse Hawk saw Aurel on November 4, 2015, for his toenail, bladder, and abdominal issues. *Id.* at 77-78. He reported that the Tolnaftate cream was ineffective. His toenails were found to be thick and hard with no discoloration. A urine dip was performed in response to Aurel's belief that he had a bladder infection due to abdominal pain. The results were within normal limits. Aurel's Miralax regimen was reordered per his request. *Id.*

## II. Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S.

13

1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because Aurel is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the

14

trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III.  Discussion

### A.  Supervisory, Respondeat Superior, and Personal Liability

Under 42 U.S.C. § 1983, medical liability on the part of Warden Bishop requires a showing that "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) that the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990) (internal citations omitted).   Aurel has failed to show, much less allege, that Warden Bishop had any personal involvement in, or deliberately interfered with, Aurel's medical care.  The claim against Bishop shall be dismissed.

Further, Aurel names Wexford Health Sources, Inc. as a defendant.  As argued by Wexford (*see* ECF 7 at 16-17), such Eighth Amendment claims may not be raised against it as a corporate entity, under 42 U.S.C. § 1983.  I agree.

Principles of municipal liability under § 1983 apply equally to a private corporation. Therefore, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondent superior*.  *See Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009); *Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982).

I turn to the merits of Aurel's Eighth Amendment claim against the individual Medical Defendants.

### B. Eighth Amendment Liability Against Medical Defendants

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see King v. Rubenstein*, ____ F.3d ____, 2016 WL 3165598 at *6 (4th Cir. June 7, 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

In order to state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted, objectively, the medical condition at issue must be serious. This is because there is no expectation that prisoners will be provided with unqualified access to health care. *See Hudson v.*

*McMillian,* 503 U.S. 1, 9 (1992). Proof of an objectively serious medical condition, however, does not end the inquiry.

In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001).

The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *King*, 2016 WL 3165598 at *6. As the *King* Court recently reiterated, "The requisite state of mind is . . . 'one of deliberate indifference to inmate health or safety.'" *King*, 2016 WL 3165598, at *7 (citation omitted). Although this "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

The Fourth Circuit has explained: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). The Court has also said: "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844). However, if a risk is obvious, a prison official "cannot hide behind an excuse that he was

unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105; *see Makdessi v. Fields*, 789 F.3d 126, 133, (4th Cir. 2015).  And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence. . . ." *Id.* at 134.

The Fourth Circuit has characterized the applicable standard as an "exacting" one.  *Lightsey*, 775 F.3d at 178.  As the Court observed in *Lightsey,* deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Young*, 238 F.3d at 575.  Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

If the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, "[a] prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances." *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at *2-3 (D. Md. June 4, 2012) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *see Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977).  Moreover, "any negligence or malpractice on the part of … doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166

18

(4th Cir. 1998).  Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice.  Rather, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable."  *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

In this case, Aurel's voluminous medical records and the unrefuted Affidavit of Dr. Robustiano Barrera virtually speak for themselves in establishing that there is no merit to Aurel's claims.  Aurel was seen countless times by nurses, physicians, and a gastrointestinal specialist for his many sick-call complaints.  He was prescribed a host of medications for his conditions.  He underwent a CT scan, a colonoscopy, an endoscopy.  Biopsies were performed. He was diagnosed with gastritis, with no significant esophagitis, hemorrhoids, and mild diverticulosis.  The medical care Aurel received reflects substantial care and attention, which more than met the minimum constitutional requirements.[19]  No Eighth Amendment violation has been demonstrated.

Insofar as Aurel seeks injunctive relief, complaining that he has had untreated symptoms of right side abdominal pain, blurred vision, coughing and throat and chest pain, a preliminary injunction is an extraordinary and drastic remedy.  *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Under the law in this circuit, the party seeking a preliminary injunction must establish that "he is likely to success on the merits at trial; that he is likely to suffer irreparable harm in the absence

---

[19] Aurel had filed a prior case complaining that he had been denied medical treatment for numerous maladies.  The case was fully briefed and dismissed upon my determination that Aurel had received extensive and constitutionally adequate medical care.  *See Aurel v. Wexford, et al.*, Civil Action No. ELH-13-3271 (D. Md.)

of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 19 (2008); *Real Truth About Obama, Inc. v. Federal Election Com'n,* 575 F. 3d 342, 346 (4th Cir. 2009), vacated on other grounds, 558 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

The *Winter* standard requires the district court to find that the party seeking the injunction has made a "clear showing" that he is likely to succeed on the merits. *Winter,* 555 U.S. at 22. This standard compels the moving party to show that he is *likely* to prevail. Regardless of the balance of hardships, it is insufficient for the party to show only that "grave or serious questions are presented" in the litigation. Second, the moving party must make a clear showing that he is likely to be irreparably harmed if preliminary relief is denied.   To meet this test, the party must show more than a mere *possibility* of harm.  Third, the moving party  must show that the balance of equities tips in his favor.  *Id.* at 20.  Fourth, the district court must consider whether grant or denial of the injunction is in the public interest. The court must give "particular regard" to the public consequences of granting a preliminary injunction.  *Id.* at 9, 24; *Real Truth,* 575 F.3d at 347.  Each requirement must be fulfilled as articulated.   *Id.*   Courts should grant preliminary injunctive relief involving the management of prisons only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). A plaintiff must show that the irreparable harm he faces in the absence of relief is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

Aurel has failed to show that he will succeed on the merits of his case and that he will be subject to immediate and irreparable harm if emergency relief is not granted.   There is no

demonstration of deliberate indifference on the part of medical staff.   Injunctive relief is not warranted.

## V.      Conclusion

For the aforementioned reasons, defendants' motions for summary judgment shall be granted.

Aurel's request for injunctive relief shall be denied.   A separate Order follows.


Date:  July   1, 2016                              _____/s/_____
                                                   Ellen L. Hollander
                                                   United States District Judge